**John C. SAILORS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 4:02CV3351.**

United States District Court,
D. Nebraska.

Dec. 10, 2003.

---

Mary S. Wenzl, Wenzl Law Office, Lincoln, NE, for Plaintiff.

Ellyn Grant, Assistant United States Attorney, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a difficult social security appeal. John C. Sailors (Sailors) claims that an Administrative Law Judge (ALJ) failed to properly evaluate his credibility when the judge denied Sailor's application for benefits. Among other things, Sailors claimed that he suffered from hepatitis [1] (the B and

---

1. "Hepatitis is an infection that primarily affects the liver and it is often caused by specific viruses...." *Kohl v. Woodhaven Learning Ctr.*, 865 F.2d 930, 933 (8th Cir.1989). Two of those viruses are Hepatitis B and Hepatitis C. Viral Hepatitis Fact Sheet, at http://www.cdc.gov.ncidod/diseases/hepatitis (last visited December 6, 2003). About 30 percent of those with Hepatitis B have no signs or symptoms. Hepatitis B Fact Sheet, at http://www.cdc.gov.ncidod/diseases/hepatitis/b (last visited December 6, 2003). "The most common symptoms of hepatitis B are an inflammation of the liver and a mild flu-like illness." *Kohl*, 865 F.2d at 933. About 10 percent of those suffering from the disease require hospitalization for more serious liver disease and liver cancer. *Id.* Less than 1 percent suffer fatal deterioration of the liver function. *Id.* Regarding Hepatitis C, "[m]any people with chronic hepatitis C have no symptoms of liver disease." Chronic Hepatitis C: Current Disease Management, at http://www.digestive.niddk.nih.gov/ddiseases/pubs/chronichepc (last visited December 6, 2003) (Clinical Symptoms and Signs). "If symptoms are present, they are usually mild, non-specific and intermittent." *Id.* Those symptoms may include fatigue, mild right-upper quadrant discomfort or tenderness, nausea,

C viral types); liver damage; headaches; hypertension; abdominal pain; diabetes; pain; leg, arm and hand problems; and depression. At the hearing, Sailors essentially testified that because of these ailments he was too tired and he was in too much pain to work (e.g., Tr. 66–67, 69–70, 75–77).

Although extremely well argued by his counsel, I ultimately find and conclude that the ALJ's evaluation of Sailors' credibility did not violate the law. Therefore, I affirm the decision of the Commissioner.

## I. BACKGROUND

Like most social security cases, the record here is voluminous. With that understood, I next briefly summarize the procedural history, the evidence and the ALJ's decision.

### Procedural History

This is a proceeding under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. (the Act). Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides that "[t]he final determination of the Commissioner ... shall be subject to judicial review as provided in section 205(g) [42 U.S.C. § 405(g) ] to the same extent as the Commissioner's final determination under section 205."

Plaintiff filed an application for supplemental security income (SSI) benefits based on disability under Title XVI on February 29, 2000. (Tr. 357–61.)[2] The application was denied initially (Tr. 320, 322–25) and on reconsideration (Tr. 321, 328–31). On March 4, 2002, following a hearing, the ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Social Security Act. (Tr. 16–32.) On November 1, 2002, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 12–13.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### Evidence

Plaintiff stated that he was born July 10, 1953, and alleged that he became disabled beginning July 16, 1998 (Tr. 358) when he was 45 years old. Plaintiff amended his alleged onset date of disability to February 29, 2000, at the administrative hearing. (Tr. 19, 63.) In his Disability Report, he alleged disability due to hepatitis B and C and liver problems. (Tr. 358.)

Plaintiff was treated at the Bryan LGH Medical Center West (Bryan Hospital) emergency room on January 13, 2000, for evaluation of hypertension, dizziness, and light headaches. (Tr. 426–27.) Chuck S. Tomek, M.D., diagnosed Plaintiff with hypertension and hyperglycemia and the doctor increased Plaintiff's dosage of Clonidine.[3] (Tr. 427.) Dr. Tomek advised Plaintiff to follow up with a family physi-

poor appetite and muscle and joint pains. *Id.* Like Hepatitis B, Hepatitis C can cause serious illness. "The Hepatitis C virus, which infects at least 150,000 Americans each year, 'remains in the blood for years and accounts for a large percentage of cirrhosis, liver failure, and liver cancer cases.'" *Downs v. Hawkeye Health Serv., Inc.*, 148 F.3d 948, 949 n. 2 (8th Cir.1998) (quoting *Stedman's Medical Dictionary* 784 (26th ed.1995)).

2. Plaintiff previously filed applications for disability insurance benefits and SSI in August, 1998. (Tr. 43, 127–29, 304–07.) These applications were denied following a hearing (Tr.

40–52), and no appeal was taken. (See also the transcript (Filing 14) regarding this earlier application and the hearing held on September 17, 1999 in regard to that application.) Plaintiff's counsel in this case explicitly stated that she did not intend to try to reopen this earlier application. (Tr. 63.)

3. Clonidine is a medicine used to treat high blood pressure, opiate and alcohol withdrawal, and other problems. Toxicity, Clonidine, at http://www.emedicine.com/emerg/topic809.htm (last visited December 6, 2003) (Introduction).

cian, and he informed Sailors that "[h]e was more than welcome to return at any time." (Tr. 427.) Examination revealed Plaintiff's extremities were normal. (Tr. 426.) Plaintiff had a blood pressure of 192/121 and glucose of 218. (Tr. 426–27.)

Plaintiff was again treated at the Bryan Hospital emergency room on August 10, 2000, with complaints of diarrhea. (Tr. 431–32.) Kenton Sullivan, M.D., diagnosed Plaintiff with a history of chronic hepatitis C with stigmata of chronic liver disease and with acute diarrhea which was most likely an infectious colitis. (Tr. 432.) Dr. Sullivan commented that when Plaintiff was last treated in the emergency room for exacerbation of hypertension, he was urged to seek follow up care with a primary care physician, but he had not done so. (Tr. 432.) Dr. Sullivan again urged Plaintiff to seek follow up care, as he might need therapy for potential diabetes. (Tr. 432.)

On August 23, 2000, Plaintiff was seen at the Lincoln Centre Clinic to establish a primary care provider. (Tr. 519–21.) Chris Lohry, PA–C, diagnosed Plaintiff with fatigue, a history of hepatitis, hypertension under poor control, untreated diabetes, reported weight loss, rectal condyloma, and depression. (Tr. 519.) Plaintiff reported that he had previously been prescribed Interferon, but that he did not have insurance and was unable to afford such treatment. (Tr. 521.) Plaintiff reported that he smoked one pack of cigarettes per day and drank as much as a bottle of wine with dinner. (Tr. 521.) Ms. Lohry advised Plaintiff to look into Medic-

aid or other insurance, and gave him samples of Effexor.[4] (Tr. 519.)

Plaintiff followed up at the Lincoln Centre Clinic on September 15, 2000. (Tr. 517–18.) Ms. Lohry stated an ultrasound revealed mild splenomegaly[5], but liver findings were consistent with old hepatitis. (Tr. 517.) Mr. Lohry advised Plaintiff to take his Clonidine at night so that he would be less sleepy and, in consideration of Plaintiff's lack of insurance, opted to delay performing any further tests. (Tr. 517.)

A consultative physical examination of Plaintiff was performed on October 19, 2000, by Karen K. Phillips, M.D. (Tr. 436–42.) Dr. Phillips noted that Plaintiff's blood pressure was significantly elevated (170/120) (Tr. 439) and recommended evaluation by a specialist (Tr. 441). The doctor stated Plaintiff's liver was enlarged and that he was a candidate for liver biopsy and likely Interferon[6] treatment. (Tr. 441.) As a result, Dr. Phillips stated Plaintiff had right upper quadrant abdominal pain especially with lifting. (Tr. 441.) Dr. Phillips also suggested further evaluation of Plaintiff's blood glucose level. (Tr. 441.) The doctor opined that Plaintiff's history of chronic fatigue and headaches were likely related to the above medical problems. (Tr. 441.) Dr. Phillips instructed Plaintiff to follow up with his personal physician or the health department for continued evaluation at minimal cost. (Tr. 441.)

On October 20, 2000, Plaintiff followed up with Ms. Lohry. (Tr. 516.) Ms. Lohry diagnosed Plaintiff with poorly controlled

---

**4.** This is a drug used to treat depression and anxiety. Effexor FR, at http://www.effexor.com/b/b1.asp (last visited December 6, 2003) (How Effexor XR Works).

**5.** This means an enlargement of the spleen. *Stedman's Medical Dictionary* 1676 (27th ed.2000).

**6.** Interferon is a an antiviral drug used to treat chronic Hepatitis B and C. Viral Hepatitis Fact Sheet, at http://www.cdc.gov/ncidod/diseases/hepatitis/b (last visited December 6, 2003) (Treatment and Medical Management); Chronic Hepatitis C: Current Disease Management, at http://digestive.niddk.nih.gov/ddiseases/pubs/chronichepc (last visited December 6, 2003) (Treatment).

hypertension, alcohol abuse, a history of hepatitis C, and depression. (Tr. 516.) More samples of Effexor were provided, as Plaintiff reported improvement on this medication, and Plaintiff's dosage of Clonidine was adjusted. (Tr. 516.) Plaintiff followed up with Ms. Lohry at the Lincoln Centre Clinic two more times in November 2000. (Tr. 514–15.) Plaintiff's medications were adjusted and he was provided samples. (Tr. 514–15.)

Plaintiff was treated at the St. Elizabeth Regional Medical Center emergency room on December 14, 2000. (Tr. 497–500.) Plaintiff reported that he had been having episodes of dizziness and that he had fallen from a stool at his kitchen table. (Tr. 497, 499.) Following testing, Plaintiff was discharged in good condition on December 15, 2000, with a diagnosis of syncope (likely vasovagal in origin), hypertension, and chronic headaches. Myocardial ischemia had been ruled out with a stress echocardiography. (Tr. 486.) Plaintiff was advised to follow up with Gary M. Kilian, D.O., in one week. (Tr. 486.)

On December 19, 2000, Ms. Lohry stated Plaintiff had improved control of his hypertension, which was measured at 150/94 and 142/90. (Tr. 513.) Plaintiff was provided samples of several medications. (Tr. 513.)

Plaintiff was again treated at the St. Elizabeth emergency room on January 7, 2001. (Tr. 482–83.) Plaintiff was diagnosed with chest wall pain and was prescribed Celebrex. (Tr. 483.) Plaintiff was advised to follow up with Dr. Kilian if his condition worsened. (Tr. 483.)

The medical evidence of record contains no evidence of further treatment until Au-

gust 29, 2001, at which time Plaintiff returned to the Lincoln Centre Clinic and was seen by Bradley Schauer, PA–C. (Tr. 511–12.) Examination revealed Plaintiff's reflexes at the biceps, knee, and ankle were two plus and equal bilaterally and palpation of the biceps and left lower leg did not reveal any abnormalities. (Tr. 512.) Plaintiff's blood pressure was measured at 130/80. (Tr. 511.) Mr. Schauer stated that, based on Plaintiff's blood glucose level of 488, "I think I am safe in saying that he is a diabetic now." (Tr. 512.) On August 31, 2001, Mr. Schauer reiterated that it was just discovered that Plaintiff was a diabetic with a random glucose test. (Tr. 509.) Plaintiff was provided with a glucose monitor and the importance of diet and exercise was discussed. (Tr. 509.) Plaintiff was prescribed Glucophage[7] and Mr. Schauer was able to provide him with a coupon for a free month's supply. (Tr. 509.) On this date, Sailors' blood pressure was 132/84. (Tr. 509.)

In a letter to Plaintiff's attorney dated September 8, 2001, Dr. Kilian stated Plaintiff was "almost certainly diabetic." (Tr. 480.) Dr. Kilian stated Plaintiff had not been able to keep appointments on a regular basis to follow his hypertension or monitor the progress of his hepatitis B and C. (Tr. 480.) The doctor stated Plaintiff had canceled two of his last three appointments and visited the clinic infrequently. (Tr. 480.)

The doctor was "not sure of the status of his alcoholism" but stated "I suspect that your history that he has quit drinking over the past six months is correct" since "I

---

**7.** Glucophage is an oral medication taken once a day for the control of Type 2 diabetes. Glucophage XR, at http://www.glucophagexr.com (last visited December 6, 2003). Type 2 diabetes is the most common form of diabetes, and now affects more than 14 mil-

lion Americans. *Id.* (Causes of Type 2 Diabetes). Type 2 diabetes can also be treated with injections of insulin as contrasted with oral medication. *Id.* (Treatment of Type 2 Diabetes.)

suspect that John is not feeling good enough to drink right now." (Tr. 480.) The doctor concluded by telling Sailors' lawyer that "John Sailors needs social security disability." (Tr. 481.)

As administrative hearing was held on August 25, 2001 (Tr. 62–90), at which time Plaintiff was 48 years old (Tr. 20). Plaintiff testified that he was unable to work due to dizziness; headaches; pain in the foot, ankle, and knee; and severe fatigue. (Tr. 66–67, 69–70, 74, 76–78). Plaintiff also testified to memory problems. (Tr. 67, 71–72.) Plaintiff described his fatigue and recounted a history of hepatitis. (Tr. 69–71, 74.) Plaintiff also testified to difficulty with numbness and pain in his left arm and hand. (Tr. 72–73.) Plaintiff stated that he did not receive recommended Interferon treatment for hepatitis due to a lack of funds. (Tr. 71.)

Plaintiff also explained his lack of visits to the doctor between December 2000 and August 2001 as being due to financial problems. (Tr. 74.) However, Plaintiff stated he was able to come up with the money for doctor's visits if his condition became severe[8] and that a friend, who supported him financially and with whom he lived, helped him pay for medications. (Tr. 74–75.)

Since 1996, before his alleged onset date, Sailors had resided with and was financially supported by a female friend, Mary Meister, with whom he was not intimate. (Tr. 80–81.) Sailors testified that he would attend "a lot of dinner parties" with his friend. (Tr. 81.) His friend was in the cattle business in Nebraska, Colorado and Wyoming. Because of her business interests, Ms. Meister had "a lot of social things going on that I go with her to. And Christmas parties, dinner parties, custom-er parties, things like that." (Tr. 81.) These engagements required Sailors to travel throughout Nebraska and to places like Colorado (Tr. 81–82) and Las Vegas (Tr. 83).

In the year preceding the hearing, Sailors testified that he had attended at least four to five such parties. (Tr. 83.) When asked to describe his health when going on these outings, Sailors recounted that he had "the same symptoms" but he coped with them by drinking. (Tr. 84.) However, during the six months preceding the hearing, and while he "felt good while I was drinking[,]" Sailors "realized . . . [that] I had to stop" because "something was seriously wrong with combination of drinking and whatever my problem is . . . ." (Tr. 84.) After a night of drinking, "it's like you want to die." (Tr. 84.)

Mary Meister submitted answers to a "third party questionnaire" (Tr. 423–25), but did not testify (Tr. 29). Ms. Meister stated that the plaintiff's daily routine was very limited, and involved the following:

> He gets up approximately 7:00 A.M. and makes himself and his son breakfast. By then he's tired and back to Bed. Gets up, off and on depending on his pain and usually sleeps until he can't. Then he watches a little TV or he reads. Plays the same thing over and over on the guitar at times and drives me crazy. He is very independent and performed to his best he can do since his illness.

(Tr. 425.)

### The ALJ's Decision

The ALJ decided that Sailors suffered from "severe" impairments which imposed more than slight limitations, and those were hepatitis B and C, hypertension, diabetes, and a history of alcohol abuse.[9] (Tr.

---

8. "I do come up with the money when I really start feeling bad. Then I go." (Tr. 74.)

9. Since the 1996 amendments, if alcohol or drug abuse comprises a contributing factor material to the determination of disability, the claimant's application must be denied. 42

25.) The judge found that depression did not significantly limit the ability of Sailors to perform basic work activities. (Tr. 25.)[10] The ALJ found (and the claimant does not contend otherwise) that these impairments did not meet the "listings." (Tr. 25.) The ALJ also decided that Sailors could not return to his past relevant work as a kitchen helper, heavy equipment operator, sales representative, fund raiser and rug cleaner. (Tr. 29.)

Explicitly following the well known *Polaski*[11] case, and discounting Sailors' credibility regarding his inability to perform any sustained work (Tr. 28–29), the ALJ found that Sailors had the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand for 30 minutes at a time and for a total of 2 hours in a normal 8 hour day; sit for 1 hour at a time for a total of 6 hours; and occasionally stoop, bend, kneel and crouch. (Tr. 29, 86.) The judge decided that Sailors did not have the residual functional capacity to climb ladders, and that Sailors must avoid even moderate concentrated exposure to heat, cold, fumes, and gases. (Tr. 29.)

Based upon Sailors' residual functional capacity, and a vocational expert's testimony regarding that residual functional capacity (Tr. 85–89), the ALJ decided that Sailors could do semi-skilled and unskilled sedentary work that existed in large numbers in the economy, such as sales service supervisor, invoice control clerk, cashier, information clerk, and bench worker. (Tr. 30.) Accordingly, the judge decided that Sailors was not disabled within the meaning of the law.

## II. ANALYSIS

As indicated above, Sailors attacks the ALJ's assessment of the credibility of his subjective complaints. With that in mind, I will first review the law on that issue. After that, I will apply the law to the facts.

### The Law

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities; the duration, frequency, and intensity of pain and other subjective limitations; precipitating and aggravating factors; the dosage, effective-

---

U.S.C. § 423(d)(2)(C); 20 C.F.R § 404.1535. The relevant statutory provision states, "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). While the ALJ found a history of alcoholism in Sailors case, since Sailors testified that he had stopped drinking 6 months before the hearing, the ALJ evidently (and very charitably) concluded that Sailors was not disqualified from benefits as a categorical matter under 42 U.S.C. § 423(d)(2)(C). *See, e.g., Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir.2003) (where the claimant had ceased drinking at the time of the hearing, and the ALJ did not find that alcohol abuse was a contributing factor material to the determination of disability, the ALJ erred when, because the

claimant had previously abused alcohol, the judge failed to give proper weight to a treating psychiatrist's opinion that the claimant had no ability to deal with work stress because of paranoid schizophrenia and other psychiatric illnesses).

10. During the hearing, the ALJ told Sailors' counsel that: "For the record, Counsel, we discussed very shortly before that there really is not a mental aspect in Mr. Sailors' case. And on that basis, I let the ME go. I don't see anything here particularly with regard to the mental problem. Is that your feeling as well?" (Tr. 84.) Counsel responded, "It's my feeling, Your Honor." (Tr. 84.) Counsel added, "I mean, what mental problems there are, relate to the physical problems." (Tr. 84.)

11. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984) (subsequent history omitted).

ness, and side effects of medication; and functional restrictions. *Lowe v. Apfel,* 226 F.3d 969, 971–72 (8th Cir.2000) (citing *Polaski* ). "The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole." *Id.* at 972.

On the other hand, "[w]here adequately explained and supported, credibility findings are for the ALJ to make." *Id.* (citing *Tang v. Apfel,* 205 F.3d 1084, 1087 (8th Cir.2000)). The ALJ is not required to discuss methodically each *Polaski* consideration, so long as the ALJ acknowledges and examines those considerations (as he did here [12]) before discounting the subjective complaints. *Id.* (citing *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996)).

### The Law Applied to the Facts

■ With this law in mind, I apply it to the facts. Initially, I am of the opinion that evidence as a whole (both medical and otherwise) supports the ALJ's adverse credibility assessment that, despite his testimony, the plaintiff was not too sick to do sedentary work such as that performed by a cashier. A person like Sailors—who undisputably suffers from serious, but manageable, diseases, and who does not consistently follow up with his doctors even though he can find the money when needed; who has an inconsistent prior work record and who has little motivation to work because he has been supported by a kind friend since before the onset date of his alleged disability; who has both the ability and the motivation to attend business-related dinner parties and other social gatherings as an escort for his supportive friend and who, as a result, travels throughout this state and sometimes as far away as Colorado and Nevada for that purpose—could reasonably be doubted when claiming totally disabling pain and fatigue.

Sailors' counsel attacks many of the specifics cited by the ALJ as a basis for doubting the plaintiff's credibility. While I will briefly address each of those criticisms, I must not forget the key question. That question is this: Even assuming an arguable deficiency in the ALJ's written opinion on credibility, is the ALJ's ultimate credibility assessment supported by substantial evidence such that one may conclude that the alleged deficiencies had no practical effect on the outcome of the case? *See, e.g., Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987) (an arguable deficiency in opinion-writing technique regarding the claimant's work record did not require reversal where the credibility assessment was supported by substantial evidence and the deficiency had no practical effect).

The ALJ doubted Sailors' credibility because Sailors did not seek Interferon treatment claiming lack of funds, but, the ALJ noted, Sailors was able to afford to drink alcohol. (Tr. 28.) Counsel argues that since the cost of that medication far exceeds the cost of alcohol, he would not have been able to afford the treatment even if he quit drinking, particularly because it is undisputed that he had no insurance. (Filing 21, Pl.'s Br. at 11.)

But counsel misses the point made by the ALJ. The point was not that alcohol and Interferon cost the same. Rather, the ALJ's point was that Sailors was at least partly disingenuous when he solely attributed his inability to afford treatment to the cost of this medication. In fact, the record was replete with evidence that Sailors was helped by his friend Ms. Meister regarding the cost of his medications and various health care professionals provided him

12. (Tr. 25–26.)

with drug samples and medical treatment without regard to his finances. *See Murphy v. Sullivan*, 953 F.2d 383, 386–87 (8th Cir.1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan*, 892 F.2d 747, 750 n. 2 (8th Cir.1989) (noting that "lack of means to pay for medical services does not ipso facto preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).

The ALJ pointed out that two doctors stated that Sailors did not follow up with them or with their directions, and the ALJ cited this as a reason to discount Sailors' credibility regarding the severity of his subjective complaints. (Tr. 28.) Counsel argues that there is evidence in the record that at certain other times Sailors was compliant. (Filing 21, Pl.'s Br. at 11–16.) While counsel is correct, it is undisputed that two separate doctors, over a span exceeding a year, one on August 10, 2000 (Tr. 432), and one on September 8, 2001 (Tr. 480), each clearly recounted Sailors' failure to seek treatment as directed or to keep appointments. Thus, even accepting everything counsel argues as true, the record is at best mixed about Sailors' compliance with medical directives. This evidence is particularly important on credibility because Sailors admitted during his testimony that when he "really start[ed] feeling bad" he could find the money to visit a doctor. (Tr. 74.)

In short, such a mixed record of compliance is an especially significant and legitimate reason to doubt Sailors' credibility about the severity of his subjective complaints. *See, e.g., Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991) ("The ALJ may properly consider ... the claimant's willingness to submit to treatment ... to determine the sincerity of the claimant's allegations of pain.") (citations omitted).

The ALJ indicated (Tr. 28) that Sailors' blood pressure responded to medication (e.g., Tr. 513 [13]) and cited his relatively good blood pressures readings on August 29, 2001 (130/86) [14] and August 31, 2001 (132/84) (Tr. 509) as a reason to doubt Sailors' credibility about the severity of his subjective complaints. Counsel for the plaintiff correctly points out that Sailors' earlier blood pressure readings had been elevated and that two good readings are not alone sufficient to conclude that hypertension had become benign. (Filing 21, Pl.'s Br. at 16.) But, once again, counsel misses the point. The ALJ's point was simply that Sailors' hypertension was at least partly controlled when he followed up with his doctors, and thus one had reason to doubt Sailors' credibility about being totally disabled as a result of the severity of his hypertension.

Regarding the diabetes allegation, the ALJ observed that "the Claimant takes only Glucophage for treatment...." (Tr. 28.) Plaintiff's counsel argues that this is no reason to discredit his testimony, particularly because Sailors was following the directions of the doctors and because the diabetes had only recently been confirmed. (Filing 21, Pl.'s Br. at 17.) While this information is not reason enough to doubt Sailors' credibility, it is certainly relevant as a part of the whole picture. The fact that Sailors' diabetes was being treated

---

[13]. For example, a doctor noted on December 19, 2000, that Sailors had obtained improved control of his hypertension by use of drugs and as a result "[h]e feels much better." (Tr. 513.)

[14]. Though the ALJ noted blood pressure of 130/86 (Tr. 28), the medical records to which he referred indicate 130/80 (Tr. 511).

with only oral medications, as opposed to a more painful, demanding and invasive regimen of injections, is pertinent to the question of the severity of Sailors' subjective complaints insofar as those complaints might be attributed to diabetes. That is precisely why *Polaski* requires attention to the dosage, effectiveness, and side effects of medication.

Regarding Sailors' claim of pain in his left upper extremity and his legs, the ALJ observed that physical examination of those areas had "been essentially negative" and the claimant testified that "such conditions are 'okay' after applying Icy Hot." (Tr. 28.) Plaintiff's counsel quibbles with the factual accuracy of the ALJ's observations. (Filing 21, Pl.'s Br. at 17–18.) I have reviewed the record. With respect to the physical examinations being "essentially negative," there is medical evidence in the record to support the ALJ's assertion. (Tr. 426, 439, 512.) Regarding the "Icy Hot" question, the ALJ's summary of Sailors' testimony was also essentially accurate. (Tr. 73.) [15]

With regard to Sailors' present complaints about headaches, the ALJ observed that Sailors took aspirin to control the headaches. (Tr. 28.) The judge also noted that Sailors had previously stated that such headaches were partially attributable to his drinking. (Tr. 28.) Regarding this last point, if Sailors was truthful that he had stopped drinking six months earlier, but he had also earlier attributed his headaches in part to drinking, his claim of disabling headaches at the hearing would be suspect.

Again, counsel attacks the factual accuracy of these observations. (Filing 21, Pl.'s Br. at 18–19.) My review of the record persuades me that the ALJ's statements were an essentially accurate summary of the evidence. (Tr. 437.) [16]

The ALJ stated that Sailors' memory complaints were inconsistent with a doctor's observation that the plaintiff "was a good historian" whose memory "appeared to be intact." (Tr. 28 (referring to Tr. 439).) Counsel attacks these observations because the doctor's notes were made in October, 2000 and because in another medical record the claimant described memory problems. (Filing 21, Pl.'s Br. at 20.) Again, this is a quibble. At the very least, the medical records are equivocal regarding a memory problem so severe that Sailors could not work.

The ALJ wrote that "the record does not support the Claimant's allegation that he is able to stay on task for no more than five minutes at one time." (Tr. 28.) Counsel indicates that the plaintiff did not literally testify that his concentration was limited to five minutes. (Filing 21, Pl.'s Br. at 20–21.) While counsel is correct that the ALJ slightly erred when describing the claimant's testimony, the record indicates that the ALJ's summary was basically accurate. (Tr. 72,[17] 77 [18].) In this regard, it is interesting to note that Plaintiff's counsel was not literally accurate either when she summarized plaintiff's testi-

---

**15.** "And what I do is just rub Icy Hot on it until they [the pains] go away, so I can sleep."

**16.** This medical record states: "The headaches are brought on by his drinking but will occur at other times. He uses over the counter pain relievers, occasionally taking up to five aspirin tablets in an hour."

**17.** "Like, I'm going to take a shower and go down to town to pick something up. And here I am driving down the road, and didn't take a shower."

**18.** The claimant was asked: "How long can you read at a time?" He responded: "About five or ten minutes, and I—the reading gets me tired for some reason. I don't know why, but I want to close my eyes and rest."

mony on this point for a hypothetical question she put to the vocational expert. That is, she implied a similar conclusion about the plaintiff's testimony. (Tr. 88–89.) In short, there was no harm caused by the ALJ's slight mistake in describing the testimony. The important truth is that the record was not supportive of the plaintiff's subjective claim of a serious inability to concentrate.

The ALJ commented on the plaintiff's previous work record. The judge wrote that:

> In regard to his work history, the record shows that the Claimant has had some years of fairly good earnings and many years of no earnings at all. However, it is noted that an individual's work record cannot be the determinative factor in judging credibility and is only useful in determining whether an individual is or is not motivated to work.

(Tr. 28–29.) [19] Plaintiff's counsel does not dispute the factual or legal accuracy of the ALJ's observation. Rather, counsel argues that the ALJ does not explicitly state what significance the ALJ attached to Sailors' work record. (Filing 21, Pl.'s Br. at 23.) I do not think this criticism is apt. The ALJ noted a spotty work record because, as the judge stated, this helped the judge understand whether Sailors was motivated to work. An inconsistent work record is, obviously, a negative when it came to deciding whether Sailors was motivated to work.

■ Sailors' last criticism deals with the ALJ's rejection of Mary Meister's notarized statement about Sailors' inability to work. (Filing 21, Pl.'s Br. at 23–25.) In regard to Sailors' claim of a total inability to work as buttressed by Meister's statement, the judge wrote in pertinent part that:

> The record contains a third party report . . . which is additionally not found credible since such statements are also not supported by objective evidence of record, and the witness did not appear at the hearing and testify under oath. Further, it is noted that such witness' report appears to conflict somewhat with the Claimant's testimony in that the Claimant testified to numbness and pain in his upper extremity and the witness reported that the Claimant's hobby is playing the guitar.

(Tr. 29.) Plaintiff's counsel argues that the statement was notarized and thus should not have been discounted and counsel further argues that it is not inconsistent to play the guitar on days when Sailors did not experience pain or numbness.

For several reasons, I am not persuaded by this final criticism. First, the fact that Meister did not appear to testify is relevant to whether her notarized statement should be given substantial weight. Since she was not personally present, the ALJ could neither observe her while testifying or ask her questions. These are important tools for determining credibility. While the ALJ could not (and did not) ignore Meister's out-of-court statement, the judge was not compelled to adopt it uncritically either. Second, the fact that Meister stated that Sailors "[p]lays the same thing over and over on the guitar at times and drives me crazy" (Tr. 425) is, in fact, "somewhat" inconsistent, as the ALJ noted, with Sailors' "inability to perform virtually any type of work activity on a sustained basis . . . ." (Tr. 29.) This is particularly true where, as here, the claimant testified about pain and numbness in his left arm and hand. Third, the ALJ was not obligated to credit this lay witness's testimony on Sailor's capacity to work

---

19. Sailors' earnings for the years 1986 through 2001 appear in the record. (Tr. 367–68.) He had no earnings in 1986, 1992–1994, and 1997–2001.

since Meister was not qualified to express such an opinion. *Ostronski v. Chater,* 94 F.3d 413, 419 (8th Cir.1996) (observing that lay witnesses are not qualified to render an opinion as to a claimant's capacity to work). Finally, since Meister's testimony is discredited by the same evidence that tends to prove Sailors' claims are not credible, there is no reversible error in any event. *Lorenzen v. Chater* 71 F.3d 316, 319 (8th Cir.1995) (arguable deficiency in ALJ's opinion does not require reversal when the witness's testimony is discredited by the same evidence that proves claimant's claims are not credible).

### III.   CONCLUSION

Sailors' able counsel has written an excellent brief explaining why the ALJ could have reasonably believed Sailors and awarded him benefits despite the ALJ's detailed opinion to the contrary. However, the fact that ALJ could reasonably have believed Sailors is not the correct question on appeal. Rather, the pertinent question is this: Was the ALJ's decision to disbelieve Sailors' testimony about his subjective complaints founded upon substantial evidence? After careful consideration, I decide that it was.

IT IS ORDERED that judgment will be entered, by separate document, for the defendant and against the plaintiff providing that the plaintiff shall take nothing and his appeal is dismissed with prejudice.

### JUDGMENT

Pursuant to the court's memorandum and order filed this date, the final decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g) and the plaintiff's appeal is dismissed with prejudice.